Thomas R. STEWART, Appellant (Petitioner below),

v.

Debra R. STEWART, Appellee (Respondent below).

No. 49A04–8702–CV–42.

Court of Appeals of Indiana, Fourth District.

April 20, 1988.

Rehearing Denied May 18, 1988.

Timothy A. Rowe, David W. Hamilton, Austin, Rowe & Hamilton, Indianapolis, for appellant.

David F. Hamilton, Jean M. Terpstra, Barnes & Thornburg, Richard A. Waples, Indiana Civ. Liberties Union, Indianapolis, for Indiana Civ. Liberties Union and Amicus.

Leslie P. Simpson, Mary T. Wolf, Legal Services Organization of Indiana, Inc., Indianapolis, for appellee.

MILLER, Presiding Judge.

Thomas R. Stewart, who has tested positive for the AIDS virus, appeals the termination of his parental visitation rights with his two year old daughter, Kara Stewart. The issues raised on appeal include:

1. Whether the trial court abused its discretion in terminating Thomas' parental visitation rights on the basis that he presented a physical danger to Kara;

2. Whether the trial court abused its discretion in denying Thomas' due process rights by refusing to permit Thomas to present certain witnesses on his behalf; and

3. Whether Thomas was denied the opportunity to present his case in a fair and impartial forum.

Based on a thorough review of the record and pertinent case law, we conclude: (1) that the trial court's decision to deny Thomas' emergency petition for change of custody should be affirmed, and (2) that Thomas' visitation rights were improperly terminated.

On September 6, 1985, Thomas petitioned for the dissolution of his marriage to Debra Stewart. On December 6, 1985, a "Decree for Dissolution of Marriage" was entered. Debra was awarded custody of Kara, who had been born on October 31, 1984. At the time of the dissolution, Debra resided in California and Thomas in Indiana. As a result, the dissolution decree provided that Thomas was to have reasonable visitation with Kara which was defined as being not less than two months of visitation during the summer while Debra lived outside the State of Indiana. If Debra moved back to Indiana, visitation was to be on alternate weekends and alternate holidays.

On October 9, 1986, while Debra was in Indiana, Thomas filed a "Verified Petition for Emergency Temporary Custody and Contempt," alleging that Debra had refused to let Thomas exercise his visitation rights. It also asserted that Kara was not receiving adequate nourishment and was being given alcohol and narcotics, and an extreme emergency existed with regard to Kara's physical, mental and emotional condition. As a result of the petition, the trial court issued an order forbidding Debra to leave the jurisdiction. Debra denied all the allegations and filed a "Verified Petition for Modification of Custody and Contempt," alleging that Thomas had failed to make timely child support payments. She further claimed that Thomas led a homosexual lifestyle, was infected with the AIDS virus, lived in substandard housing with ten other occupants and lived in a household in which there was violence. Debra also asserted that the two month summer visitation out of her presence would upset two year old Kara, who had never been out of her mother's care.

On October 24, 1986, a hearing was held to consider the pending petitions. The parties agreed that, although Thomas would proceed first, the testimony of the witnesses could be considered in determining both petitions. Thomas' witnesses were himself, two doctors (whose testimony will be discussed later), his former wife Debra and his niece, Sandra Cole (also Debra's cousin). Thomas testified that he had a good home environment. He lived with his parents and sister and her three children in a 1,250 square foot, three bedroom, two-story home in a residential area. The home had all modern appliances. Thomas was self-employed in the excavating business. Since the divorce—granted less than a year before the hearing—Thomas fell behind 36 weeks in his support payments. He made a lump sum payment and was current at the time of the hearing. He based his contention that emergency custody was necessary solely on telephone conversations with Debra. He claimed that in the conversations Debra admitted that she was using drugs and alcohol and stated that she gave Kara beer, which she didn't consider harmful, and that on one occasion the child accidentally ate half a marijuana cigarette. Debra, on the other hand, denied making these statements to Thomas. She stated that, although she had suffered drug and alcohol problems in the past, she was not a

current user. Thomas' niece, Sandra Cole, testified that she visited Debra in California for one day and in the evening, at a dinner party with six guests present, she observed the consumption of alcoholic beverages. She stated that she thought there was an unspecified drug present. She did not testify that Debra mistreated the child in her presence. At this point, Thomas represented to the court that his next witness, his father Fred Stewart, would corroborate the telephone conversation in which Debra allegedly stated that: (1) she gave Kara beer, and (2) Kara had accidentally eaten half a marijuana cigarette. However, the court did not permit Fred Stewart to testify, stating that, even assuming he would corroborate Thomas' testimony, the evidence was clearly insufficient to support the granting of an emergency petition for change of custody. The court then proceeded, apparently based upon the testimony of Thomas' witnesses, to find in favor of Debra's motion for modification, although Debra did not request total termination of Thomas' visitation. The court commented that Thomas had proven that he had AIDS and, under those circumstances, "even if there was a one percent chance that this child is going to contract it from him, I'm not going to expose her to it," and proceeded to terminate his visitation rights because of physical danger to the child.[1] He further authorized the mother to return with the child to California. This appeal followed.

1. At the hearing, the trial court actually stated that it was terminating Thomas' parental rights. This statement, however, was clarified by the trial court's docket entry which limited the termination to visitation rights.

2. Thomas, Debra and the amicus curiae (Indiana Civil Liberties Union) all have submitted appendices with their briefs. The materials contained in the appendices vary but basically fall into three categories: cases, medical articles mentioned by the expert witnesses at trial and medical articles not mentioned by the experts at trial. None of the materials was introduced as evidence at trial. While there is no dispute that the cases are subject to consideration, there is a question concerning the medical literature. Debra takes the position that we may not consider any of the medical literature presented in the appendices while Thomas suggests we may take judicial notice of the materials and consider them in reaching our decision

Thomas first argues that the trial court erred in not permitting his father to testify and corroborate his testimony. We agree. Of course, the parties should be permitted to present their witnesses in order to establish their case. This right can be abused, for instance, by presenting a number of witnesses with cumulative evidence. This was not the case here. But, while on the one hand we agree with Thomas' assertion of error, on the other hand we believe the error here to be harmless for several reasons. First, the evidence of emergency based on Debra's inadequacy as a parent was skimpy and supported for the most part by self-serving testimony by Thomas. There was no substantial testimony by anyone that they had direct contact with Debra in California and were familiar with her life style and the manner in which Kara was being raised. Further, the court was aware of Fred Stewart's potential testimony and indicated that Stewart's testimony would not affect the court's decision. Therefore, we conclude that the error committed by the trial court was harmless and, since the evidence was conflicting, we must affirm the trial court's decision to deny Thomas' emergency petition for custody.

The key issue in this case is whether the trial court abused its discretion in terminating Thomas' visitation rights with Kara.[2] Visitation by non-custo-

or may consider the materials because of the important public issue involved. Judicial notice may be taken of medical facts that are not subject to reasonable dispute. *Hardy v. Johns-Manville Sales Corp.* (1982), 5th Cir., 681 F.2d 334, 347. Facts that are judicially noted must be generally known or capable of accurate determination by resort to sources whose accuracy cannot reasonably be questioned. *Prestige Homes, Inc. v. Legouffe* (1983), Colo., 658 P.2d 850, 853. Judicial notice has traditionally been used cautiously and only when the facts judicially noted cannot reasonably be disputed. Judicial notice may not be used on appeal to fill gaps in the evidence. *City of New Brunswick v. Borough of Milltown* (1982), 3d Cir., 686 F.2d 120, 131, n. 15.

In the present case, we are asked to take judicial notice of several articles containing in-depth information regarding the AIDS virus. Unlike the court in *Evans v. Indiana University*

dial parents is provided for by IND.CODE 31–1–11.5–24 (Supp.1987), which states in part:

(a) A parent not granted custody of the child is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation by the parent might endanger the child's physical health or significantly impair his emotional development.

(b) The court may modify an order granting or denying visitation rights whenever modification would serve the best interests of the child, but the court shall not restrict a parent's visitation rights unless it finds that the visitation might endanger the child's physical health or significantly impair his emotional development.[3]

Indiana has long recognized that the right of parents to visit their children is "a sacred and precious privilege" which should be enjoyed by non-custodial parents. *Partridge v. Partridge*, (1971) 257 Ind. 81, 272 N.E.2d 448, 450. However, the right of visitation is subordinated to the best interests of the child. Thus, under IND.CODE 31–1–11.5–24(a) and (b), visitation may be denied or restricted only if the trial court finds that visitation might endanger the child's physical health or significantly impair his emotional development.

*Medical Center* (1951), 121 Ind.App. 679, 100 N.E.2d 828, 830, where the court judicially noted that pulmonary tuberculosis was a disease to which the general public was exposed, we, in essence, are being asked to judicially note the specific methods by which AIDS is communicated. While we have no problem with noting that AIDS is a severe and communicable disease, we cannot judicially note the ways in which it is communicated. Research continues in an attempt to specify the methods of communication but the data is not all collected and the methods of communication are not so firmly established as to be beyond reasonable dispute. Taking judicial notice of the scientific and medical data contained in the articles would put us in the role of expert witnesses and thereby result in the expansion of judicial notice far beyond its intended scope. *Prestige Homes, Inc., supra,* 100 N.E.2d at 854. *See also Roe v. Wade* (1973), 410 U.S. 113, 207, 93 S.Ct. 705, 755, 35 L.Ed.2d 147 (Burger, C.J., concurring).

We recognize that judicial notice may be taken of government publications that have not been introduced into evidence. *See Kavanagh v. Butorac* (1966), 140 Ind.App. 139, 221 N.E.2d 824, 833. However, because of the continuing nature of AIDS research, the proper method of presenting medical information in the present case is through experts familiar with the disease and the current developments in research. Therefore, the review on appeal will be limited to the evidence presented at trial. However, even if the medical literature contained in the appendices were considered, the result of this decision would remain the same.

**3.** Neither party suggests that the word "might" in the statute ("visitation by the parent *might* endanger the child's physical health or significantly impair his emotional development") requires only a mere *possibility* that the physical or mental health of the child would be endangered or impaired. In view of the nature of the parental right being cut off, such a construction would be an absurd one. Why would the legis-

lature acknowledge the basic right of visitation of a non-custodial parent and then effectively abolish that right by permitting terminations supported only by speculative, possibility-type evidence. Thus, we have no hesitation in concluding that statute requires evidence establishing that visitation "would" (not "might") endanger or impair the physical or mental health of the child. Case law supports our treatment of the word "might" in this context as being more than a mere possibility. In *Louisville and Southern Indiana Traction Co. v. Montgomery* (1917), 186 Ind. 384, 115 N.E. 673, our supreme court held that an allegation in a complaint that a motorman started his car while a surrey was so near the track that the car could not clear it, as the motorman "might" have discovered by ordinary care, was not insufficient. The court stated:

[W]e may concede that the grammarian recognizes a technical distinction of the correct use of the words 'might' and 'should,' and that the failure to observe this distinction has on occasion been criticized in judicial decisions. *Monroeville v. Weihl,* 6 Ohio Cir.Ct.R. 188, 196. On the other hand, it must be noted that the error is one of frequent occurrence with courts and textwriters alike, and that, at most, the difference between the two words is hardly potential enough to constitute legal irregularity sufficient to require the reversal of a judgment, particularly as applied to the situation presented in this case.

Similarly, in *U.S. v. Harrington,* 388 F.2d 520, 524 (2d Cir.1968), the court noted the standard for relevance and materiality of information sought by an internal revenue summons was whether the information sought "might" throw light upon tax liabilities under the investigation. The court held the word "might" as used in that standard meant simply that there must be "a realistic expectation rather than an idle hope that something may be discovered." *See also, United States v. Campbell* (1975), 390 F.Supp. 711.

The degree of proof required in actions involving the termination of a parental right was discussed in *Santosky v. Kramer* (1982), 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599. In *Santosky*, the natural parent's rights to visit, communicate with, or regain custody of the child were being permanently terminated pursuant to New York's permanent neglect statute. The state court determined that these parental rights could be permanently terminated if the state proved its allegations of neglect by a "fair preponderance of the evidence." The Supreme Court held that the state could not completely and irrevocably terminate the rights of parents unless the state supported its allegations with evidence that was at least clear and convincing.[4] In reaching this conclusion, the court examined and balanced three factors—the private interests affected by the proceeding; the risk of error created by the State's chosen procedure; and the countervailing governmental procedure—and stated, "Whether the loss threatened by a particular type of proceeding is sufficiently grave to warrant more than average certainty on the part of the factfinder turns on both the nature of the private interest threatened and the permanency of the threatened loss." *Santosky, supra,* 455 U.S. at 754, 102 S.Ct. at 1395-97. An examination of these factors leads us to conclude that, unlike *Santosky,* the present case does not involve a total irrevocable termination of parental rights. Rather, only the right of visitation has been terminated. While there is authority using the clear and convincing test where less than all parental rights are terminated,[5] we observe our supreme court has very recently held that where parental rights are being terminated, and the termination is revocable, the preponderance of the evidence standard is appropriate. *In re Guardianship of Thompson* (1987), Ind., 514 N.E.2d 618.

In *Thompson,* the court determined that a guardianship could be established for a child whose adoptive parents lived in Texas. The Texas couple, immediately after adopting the child, consented to the adoption of the child by an Indiana couple and permitted the child to be taken to Indiana pending the adoption. When the Indiana couple immediately thereafter filed its adoption petition, the Texas couple withdrew their consent and requested the child be returned to them in Texas. The trial judge denied the adoption petition because

4. The burden of proof essentially allocates the risk of error between the various parties to an action. The degree of proof required must be set for a given class of proceedings. It cannot be determined on a case by case basis because litigants must know at the outset of their case how the risk of error will be allocated. *Santosky v. Kramer* (1982), 455 U.S. 745, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599.

5. In *Petition of Meyer* (1984), Ind.App., 471 N.E. 2d 718 (Miller, J., concurring in result), a custodial mother petitioned to change her four and a half year old daughter's last name to match the name the mother took upon her remarriage. The child's natural father objected to the name change. The majority stated:

While a change of name action seeks to sever but one of these parental rights rather than all of them, as an adoption proceeding does, one seeking to sever the right here in question must meet this same burden of proof, that is, the evidence favoring a change of name in such circumstances must be clear and convincing.

*Id.* at 720-21. The evidence in favor of the name change consisted of the mother's testimony that both she and her daughter, Sarah, desired it. The child did not testify. Other reasons for the name change were that it would be

easier for the child in school if she had the same name as her mother and stepfather, and having the same name as her mother and stepfather would give the child a more secure feeling of family unity. The majority concluded:

No substantive evidence to support these reasons was introduced, however. The record shows only generalized allegations by Penny [the mother] these results would inure from the name change. Mere unsupported assertions by a party are not substantive evidence. *See, Coghill v. Badger* (1982), Ind.App., 430 N.E.2d 405, 406-407. There was no showing Sarah presently lacked a feeling of family unity by having a last name different from her mother's or she was in any way troubled by her last name. *Absent any facts* to rebut the statutory presumption in favor of retaining Sarah's present name, the order of the trial judge must be reversed.

*Id.* at 721 (emphasis added).

Since the court held there were no facts to rebut the statutory presumption in favor of retaining the child's name, it could be logically argued that the petitioner in that case failed to meet even the preponderance of the evidence test.

consent had been withdrawn but permitted the case to remain open pending further possible action. Then the Indiana couple filed a petition to be appointed guardians of the child which, after an evidentiary hearing, was granted. The creation of the guardianship, affirmed by our supreme court, essentially acted as a termination of the Texas couple's parental rights until the issue of adoption by the Indiana couple was ultimately resolved. In affirming, our supreme court did not specifically state the standard of proof applied, but a review of its decision leads to the conclusion that the court utilized a preponderance of the evidence test. The evidence in Thompson was conflicting in several areas, including the fitness of the Texas couple as parents. However, the evidence favorable to the Texas couple showed that the Texas Welfare Department, only months before the Indiana proceeding, had conducted a thorough investigation of the couple and found them to be fit parents. It is notable that the Texas couple had two children of their own who continued to live with them throughout this proceeding. There was evidence that the Texas couple was acting under a great deal of stress at the time they consented to the adoption by the Indiana couple—evidence which was corroborated by their Texas attorney who was also an in-law of the Indiana couple. On the other hand, the supreme court cited evidence before the trial court from which the court could have found the Texas couple was not acting in the best interests of the child [6] and concluded "[t]here were conflicts in all of these facts but the conflicts were before the trial court for resolution." *Id.* at 621. We must conclude from the result in *Thompson* that clear and convincing evidence was not required in order for the trial court to establish the guardianship which, in effect, deprived the Texas couple of all their parental rights for a temporary, but indefinite, period of time. The case before us presents an analogous situation. Here, while the loss of visitation is the loss of a significant parental right, it is not necessarily a permanent loss. A future change in condition could remove the basis for termination of visitation. Thus, we conclude the *Thompson* opinion would indicate that the burden of proof required in this case is a "preponderance of the evidence."

The case before us is also distinguishable from *Santosky* in that it involves a dispute between two parents as to visitation. It does not present a situation in which the state, of its own volition, is seeking to terminate a parental right on the basis of neglect. The private interests involved in the termination of parental visitation include the non-custodial parent's right to maintain contact with the child, the custodial parent's right to protect the child and the child's interest in maintaining contact with both parents. The state's interest is to ensure that the health and welfare of the child are protected. Unlike its role in a neglect termination proceeding, the state's role in the present proceeding does not require it to prove that the parents are unfit. Rather, the Indiana visitation statute requires the party filing the petition for modification to prove that the non-custodial parent presents a physical or mental danger to the child before the non-custodial parent's visitation rights can be curtailed or terminated. IND.CODE 31–1–11.5–24

---

6. "The facts in the instant case clearly showed the Thompsons did not live in Indiana. Other facts in evidence raised the question of whether the Thompsons were properly performing their duties as natural guardians. The Thompsons had deliberately placed Billy Joe in the Gorman's custody with the understanding that she would be brought to Indiana and adopted by the Gormans. The evidence indicated this was the Thompsons' intent at the time they adopted Billy Joe in Texas. They deliberately kept this information from the judge during the Texas adoption proceedings while the Gormans were with Billy Joe in a separate room. There was evidence from which the court could find that the Thompsons were more concerned with money than they were with Billy Joe's interests. There are facts which demonstrate the Thompsons at one time had an interest in taking Billy Joe into their home but lost that interest. There also are facts which demonstrate the Thompsons were willing to give Billy Joe to the Gormans for adoption and later changed their minds. It also was demonstrated to the guardianship court that the child was being well cared for in the Gormans' home." *Id.* at 621.

states that the non-custodial parent "is entitled to reasonable visitation." This language gives rise to the presumption that visitation will be in the child's best interest unless it is shown that the parent "might endanger the child's physical health or impair his emotional development." Thus, the presumption favoring visitation is rebuttable and unless it is rebutted, the non-custodial parent is entitled to visitation. In this context, the burden of proof establishes the level of proof required to rebut the presumption. It is the custodial parent or petitioner's responsibility to rebut that presumption. Thus, the role of the state is completely different than in a proceeding in which the state seeks to permanently terminate parental rights on the basis of neglect.

██ Further, under Indiana law, a party may obtain a modification of visitation so long as evidence is presented which shows a change in circumstances since the last visitation order was entered. *See State ex rel. Jemiolo v. LaPorte Circuit Court* (1982), Ind., 442 N.E.2d 1060, 1062. Thus, a termination of visitation is not permanent nor does it necessarily prohibit the parent from maintaining contact with the child through correspondence, telephone calls or other methods. We are aware that physical visitation is more satisfying and more meaningful but it must be acknowledged that contact with the child is not completely and irrevocably terminated when visitation is denied.[7] Because the private interest at stake, although great, is not permanently terminated and the state is not the initiator of the termination, we conclude the decision in *Thompson* is controlling here and, therefore, the party seeking termination is obligated to prove its case only by a preponderance of the evidence. In the present case, this burden was not met.

On appeal, we will reverse a judgment concerning non-custodial parent visitation upon a showing of a manifest abuse of the trial judge's discretion. An abuse of discretion occurs when the trial court's decision is "clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom." *Carter v. Dec* (1985), Ind.App., 480 N.E.2d 564, 566 (quoting *K.B. v. S.B.* (1981), Ind. App., 415 N.E.2d 749, 755). In conducting our review, we will neither reweigh the evidence nor judge the credibility of the witnesses. *Carter, supra* at 566.

██ In the present case, the medical evidence presented at the hearing on the parties' motions consisted of testimony by Dr. Robert Baker, Thomas' personal physician, and Dr. Charles Barrett, an epidemiologist employed by the Indiana State Board of Health in the area of Chronic and Communicable Disease Control. Dr. Baker stated that Thomas came to him after testing positive for the Human Immunodeficiency Virus. Dr. Baker is board certified in infectious diseases and has treated multiple patients for the virus over the past four to five years. Dr. Baker ran a complete blood count and a test on Thomas' immune system. These tests were essentially normal. Although Thomas does not have AIDS, Dr. Baker indicated that Thomas was "potentially contagious to people who would be transfused with his blood or people he would have sexual intercourse with." (R. 139) When asked if Thomas could infect anyone in his family by everyday household contact, Dr. Baker replied, "there have been no reported cases of that occurring in all the people who've had infection with this virus in households. That has not been, that has not occurred." (R. 140) On cross-examination, Dr. Baker was asked if it were possible for Thomas to pass the virus if he cut his finger while extracting one of Kara's baby teeth. Dr. Baker replied that it would be possible. Dr. Baker was not asked about the probability of AIDS being transmitted under those circumstances.

Dr. Barrett's testimony was similar to Dr. Baker's. Dr. Barrett is an epidemiolo-

---

**7.** We recognize that maintaining contact with a two year old child would be difficult absent actual visitation. The point, however, is that the loss of visitation, although great, is not necessarily permanent.

gist and had previously testified in the Ryan White school admission case. Dr. Barrett had also worked with the AIDS program at the State Board of Health. In fact, Dr. Barrett was the director of the division which carried out most of the State Board of Health's work in the area of AIDS. During the direct examination of Dr. Barrett, the following exchange occurred:

Q. If a man had AIDS, he actually had the disease AIDS, would a two year old child, living with him in the same household, be susceptible to that virus also, just by living in that household?

A. Would the child be susceptible to it, or ...?

Q. Yes. What are the chances of that two year old ---

A. --- That ---

Q. --- getting the ---

A. --- that transmission of the virus might occur, which is a little different than being susceptible, but the evidence I would say is quite to the contrary now. There have been a number of studies done even a year or so ago, there were nine studies already being reported, which involved more than three hundred household contacts of approximately a hundred AIDS cases and these studies subsequently have been enlarged upon, the studies, themselves, have enrolled more individuals, there've been additional studies done and none of these household contacts involved in any of these studies have become infected. And of course, you don't have to wait to see if they're gonna develop AIDS because of the antibody test that we were talking about earlier. A person who becomes infected with HIV will generally become positive for the antibody within a period of about three weeks to three months, and so these individuals have been followed very closely with antibody testing to see if they might sero-convert, that

is develop, the antibody themselves, and they have not.

Q. Okay. Doctor, you're speaking of someone that actually had AIDS, is that true?

A. That is correct.

Q. Okay, if a person were to not have AIDS, but have the antibody present, does that lessen the chances of being contagious to someone else in the household?

A. Well, we have to assume that a person who is positive for the antibody is infected with the virus and would have the virus present in their blood, at least at that time and would be capable, under the right circumstances, of transmitting the virus to someone else.

Q. Okay, Doctor, have there been any reported cases of transmission of the disease through blood, which was not, through blood, in any cases which weren't involving hypodermic needles or blood transfusions, for instance, cuts or scrapes?

A. There've been no cases documented as occurring through that manner, the transmission modes are via the sharing of hypodermic needles, via blood transfusions and blood products, which are given hemophiliacs, for example, and result in the infection.

(R. 153–55) When asked on cross-examination whether it would be possible for a parent to infect a child while extracting the child's tooth, Dr. Barrett replied: "I think we would have to say that there would be a theoretical possibility ... of such a direct mode, yes." (R. 158) Dr. Barrett was not questioned regarding the probability of such a transmission.

No other medical evidence or testimony was presented by either party. The only other evidence presented related to the living conditions and lifestyles of both parents. An examination of the evidence leads to but one conclusion: the medical evidence and studies available at the time of trial showed that AIDS is not transmitted through everyday household contact. The only evidence to the contrary was the doc-

tors' agreement that there was a theoretical possibility that transmission could occur during the extraction of a tooth. However, as previously noted, the doctors were not asked the probability of such an occurrence, especially in light of the fact that under the existing visitation order Thomas would have Kara only two months out of the year.

Even if the evidence of Thomas' living conditions, lifestyle and infection with the virus supported a modification of some type, it did not support a complete termination of his visitation rights. *See e.g.,* Annot., 36 A.L.R.4th 986 (discussing the imposition of visitation restrictions based on a parent's homosexual or lesbian lifestyle). Notably, Debra did not request complete termination of visitation. Rather, the trial court, after hearing Thomas' case, inaccurately stated, "[w]hat you have proved is that Mr. Stewart has AIDS, and even if, even if there's a one percent chance that this child is going to contract it from him, I'm not going to expose her to it." (R. 193) In light of the medical evidence presented, the complete termination of visitation was an extreme and unwarranted action. When courts are confronted with new situations and problems regarding visitation, they must be sure that the action taken corresponds to the danger presented. Many parents suffer from varying degrees of handicaps and illnesses. Yet those parents cannot be deprived of all visitation with their children merely because some danger exists. The level of danger must be examined and appropriate precautions taken.[8] Only in this way can both the parent's visitation rights and the child's health and welfare be fairly and fully protected. This was not done in the present case.

Finally, we can find only one reported case dealing with the termination of visitation of a parent infected with AIDS.[9] In *"Jane" W. v. "John" W.* (1987), N.Y.Sup. Ct., 137 Misc.2d 24, 519 N.Y.S.2d 603, the trial court held that the father was not precluded from visiting pendente lite with his one and one-half year old daughter because he was diagnosed as having AIDS. The father was then employed as a health care worker at a hospital and was aware of the precautions which must be taken to avoid the spread of AIDS. The court heard the medical testimony of Dr. Jeffrey Vieira, the Chief of Infectious Diseases at Brooklyn–Caledonia Hospital and a teacher at Downstate Medical School. The court described his testimony as follows:

Dr. Vieira testified about the nature of AIDS. It is transmitted through direct mixing of bodily fluids. He explained that the known methods of transmittal are sexual contact, the sharing of needles among intravenous drug abusers and the transfusion of blood (though this last method has been drastically reduced with the discovery of a blood test for the disease). Another possible transmission method is through breast milk. The doctor explained that theoretical transmission routes are through saliva, bite wounds, sharing a handkerchief or tissues and the sharing of dining utensils (i.e. a glass or a fork) though he noted that there are not any known transmissions through these methods. He also referred to an ongoing study being conducted by Montifiore Medical Center which has followed 50 families in which one member had AIDS. The study has found that there has been no transmission of the AIDS virus within the close contact of familial groupings.

8. For example, the facts in a particular case might justify the denial of visitation to a parent who is often intoxicated and thereby constitutes a danger to the child. However, "the tendency of the courts seems to be to allow visitation but to require that the visits be made in the presence of some other person or under such circumstances as will guarantee that the child will not be exposed to a parent who is under the influence of liquor." 24 Am.Jur.2d, Divorce and Separation # 1000.

9. Three recent federal cases have affirmed the right of a teacher with AIDS to teach in public school and the right of children with AIDS and children who tested seropositive for Human Immunodeficiency Virus to attend public schools. *Chalk v. U.S. Dist. Court, Central Dist. of California* (1988), 840 F.2d 701 (9th Cir.Cal.); *Ray v. School Dist. of DeSoto County* (1987), 666 F.Supp. 1524; *Thomas v. Atascadero Unified School Dist.* (1987), 662 F.Supp. 376. There was no medical evidence in any of these cases of any substantial risk of harm to school personnel or students.

Defendant is Dr. Vieira's patient. Dr. Vieira has seen defendant at least every three weeks since the summer of 1986. Since January of this year he has seen defendant more often than that.

Dr. Vieira testified that upon his release in December of 1986, defendant was in a good emotional state. He was anxious but this was reasonable given the AIDS diagnosis. Defendant is presently taking the drug AZT, which appears to inhibit the progress of the disease. The drug may also suppress the likelihood of transmitting the virus. Defendant is tolerating the drug well. Defendant was given medical approval to return to his health care work. Dr. Vieira, as a final analysis determined that defendant is a responsible, reasonable person who knows the nature of the disease which afflicts him. Defendant is also aware of the precautions which must be taken to avoid its spread (i.e. avoid sexual contact or have 'safe sex,' avoid kissing in which a large amount of saliva would pass, do not share utensils which have been immediately used, do not share tooth brushes or razors, and clean spills of urine or other bodily secretions with bleach).

519 N.Y.S.2d at 604. Relying primarily on the testimony of Dr. Vieira, the trial court held:

> ... [t]hat the issues of the defendant having AIDS and the possible transmittal of the AIDS virus should play little if any role in determining this pendente lite application for visitation.

519 N.Y.S.2d at 605. Further, the court noted that the father had training in pediatric care and therefore ordered *unsupervised* visitation one day a week from 10:00 a.m. until 6:00 p.m.

The medical testimony in *"Jane" W.* is similar to the testimony in the case before us. *"Jane" W.* supports our conclusion that the court was in error when it cut off Thomas' visitation rights.

Finally, Thomas asserts that he was denied a fair and impartial forum because the judge was prejudiced against anyone infected with AIDS. In the argument section of his brief, he calls to our attention only one specific comment by the judge, which we have quoted earlier and which occurred when the judge cut off his visitation rights. We have found that the judge's decision in this regard was erroneous. We have no reason to believe that on remand the trial court will not follow our direction and, absent any further evidence establishing that Thomas is unfit, will grant appropriate visitation to Thomas.

The decision of the trial court to deny Thomas' emergency petition for change of custody is affirmed. The case is reversed and remanded for the following purposes: (1) to hear further evidence on Debra's petition for modification of visitation; (2) to hear any further medical evidence by either party with respect to current information on AIDS; and (3) to fashion a visitation order based upon the evidence presented to the court, which visitation order shall not preclude visitation to Thomas solely on the basis that he is infected with the AIDS virus.

SULLIVAN, J., concurs.

CONOVER, J., dissents with separate opinion.

CONOVER, Judge, dissenting.

I respectfully dissent because I do not believe the trial court has manifestly abused its discretion in this matter.

As Chief Judge Ratliff recently said

> When reviewing a trial court's determination concerning visitation by a non-custodial parent we may reverse only upon a showing of a manifest abuse of the trial judge's discretion. *In re Julien* (1979), Ind.App., 397 N.E.2d 651.
>
> Such an abuse of discretion will not be found unless the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom. Our function on appeal is 'to examine the decision of the trial court and determine whether the record discloses evidence or reasonable inferences to be drawn therefrom which serve as a rational basis to support the finding of the trial court.' We will not reweigh the evidence or judge the credibility of the witnesses.

[Citations omitted]. *K.B. v. S.B.* (1981), Ind.App., 415 N.E.2d 749, 755.

*Carter v. Dec* (1985), Ind.App., 480 N.E.2d 564, 566. Thus, the question becomes what is the breadth of a trial court's discretion concerning the grant or withholding of visitation rights of the non-custodial parent in this case? Our legislature has clearly defined those parameters. IND.CODE 31-1-11.5-24 provides in part

SEC. 24. (a) a parent not granted custody of the child is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation by the parent *might* endanger the child's *physical health....*

(b) the court may modify an order granting or denying visitation rights whenever modification would serve *the best interests of the child,* but the court shall not restrict a parent's visitation rights unless it finds that the visitation *might* endanger the child's *physical health....* (Emphasis supplied).

Our legislature has determined as a matter of public policy the best interests of the child are paramount, and trial courts are to deny non-custodial parents visitation if such visitation *might* endanger the child's physical health.

I do not agree with the majority we are to restrict the meaning of "might" as used in the statute to mean visitation may be restricted only when it "would" endanger the child's physical well being. Such was not the intent of the legislature in my opinion. Had it so intended, that body would have used appropriate language such as "probably will", "reasonably may" or words of similar import. It is apparent to me the legislature intended "might" as used in the statute to carry its ordinary meaning which includes the "possibility" of an event occurring.

Our sole function on appeal is to determine whether the trial court's decision constituted a manifest abuse of discretion. The experts in this case testified to essentially two degrees of certainty as to methods by which the AIDS virus may be transmitted. First, it is reasonably certain the AIDS virus with which appellant Thomas is infected may be transmitted to third parties through sexual intercourse, the sharing of hypodermic needles, and blood transfusions.

Secondly, it is theoretically possible for a parent to infect a child with the AIDS virus while extracting a child's tooth.[1] Under these circumstances, a parent "might" infect his child with AIDS. Because the statute clearly invests the trial court with a broad discretion in this area, I believe the trial court did not manifestly abuse its discretion by denying appellant his visitation rights under these circumstances.

We may not weigh the evidence nor determine the credibility of witnesses on appeal. While we might have decided the matter differently had we been sitting as the trial court, that reason standing alone does not authorize reversal.

In sum, I would affirm because the trial court did not manifestly abuse its discretion.

---

1. Admittedly, a poor example upon which to base a hypothesis, but that was the evidence before the trial court.