## Stephen Mullin v. Rita (Mullin) Phelps

[647 A.2d 714]

No. 93-143

Present: Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.

Opinion Filed June 24, 1994

*Cortland Corsones* and *Therese M. Corsones* of *Corsones & Corsones*, Rutland, for Plaintiff-Appellant.

*Alan Rosenfeld*, Montpelier, for Defendant-Appellee.

**Johnson, J.** In this appeal, we review a family court order that transfers custody of the parties' two children from plaintiff father to defendant mother and that completely cuts off all contact between the father and his sons unless he acknowledges abusing them. The basis of the order is the court's conclusion that a preponderance of the hotly disputed evidence presented by the warring parties indicated that the father sexually abused the younger boy. We conclude that the court did not abuse its discretion in transferring custody of the children to the mother, but that due process precluded the court from effectively terminating parent-child contact between the father and his sons based on a finding of sexual abuse by a mere preponderance of the evidence. We hold that, as a matter of due process, the family court may terminate parental rights only if the evidence supporting the decision is clear and convincing, a standard that was not remotely satisfied in this case. We also conclude that the part of the court's order conditioning future parent-child contact on the father acknowledging that he sexually abused his son must be stricken because it violates the father's privilege against self-incrimination. Accordingly, we remand the matter for the family court to fashion a visitation order that comports with due process and that is consistent with the principles discussed in this opinion.

I.

We detail the events surrounding the various proceedings in this protracted, acrimonious custody battle in order to place the family

court's most recent decision in the proper perspective.[1] The parties separated in 1986 after a tumultuous eight-year marriage that produced two children. At that time, the children, Jeremy and Kyle, were six years old and one year old, respectively. Following the separation, the children lived primarily with the father. In November 1987, in response to a court-ordered evaluation in the divorce proceeding, the Vermont Children's Aid Society recommended that the children remain in the custody of the father and his new wife, based on its conclusion that joint custody was not feasible because neither party was able to place the children's welfare above the resentment and anger they felt towards each other. Nevertheless, based on the parties' stipulation, the court ordered joint custody, with the father and his wife having primary physical custody.

In 1989, the father sought full legal and physical responsibility for the children. The mother responded by alleging that the father had physically abused them. Based on numerous interviews with the parties and the children, the Champlain Valley Psychiatric Services found no evidence of physical abuse; indeed, it concluded that physical discipline occurred more often in the mother's home. As had previous evaluators, the two clinical psychologists and social worker noted that the children were integrated into the father's home, but that the older child, Jeremy, appeared to be highly stressed as the result of the continuing conflict over custody. The team recommended that the father be awarded sole custody. In May 1990, the court granted the father's motion to modify, and awarded him sole custody of the children. The mother appealed, and we affirmed the decision.

In August 1990, shortly after the trial court's decision, the mother filed a petition for relief from abuse, alleging for the first time that the father had sexually abused the children. According to the mother, during visits in the spring and summer of 1990, Kyle, then age 5, requested on three separate occasions that she put a stop to the "bug game." Allegedly, this "game" consisted of the father inserting his finger in Kyle's rectum or placing his penis in the child's mouth. Jeremy, then age 10, stated that his father had sexually assaulted him five years before, and that Kyle had been similarly assaulted during the summer of 1989. An investigation by the Department of Social and Rehabilitation Services (SRS), which included a medical examination of Kyle and a psychological evaluation of the family, revealed no evidence of abuse. An SRS investigator concluded that there was

---

[1] The family court took judicial notice of findings of that court in prior proceedings.

insufficient evidence to substantiate the mother's allegations, and expressed concern that the allegations of abuse seemed to be made during times of change in custody or when the boys' visitation with the mother was about to end.

In a lengthy opinion, the court found that the mother had failed to produce sufficient evidence to prove the alleged abuse by a preponderance of the evidence, and denied the motion for relief from abuse. Further, the court concluded that the protracted custody proceedings and the mother's prior, unsuccessful abuse petitions reflected "the natural mother's continuing efforts to gain child custody, wherein she has been unsuccessful in all of the other various procedures before the courts." According to the court, the mother's custodial crises formed "the genesis of the abuse claims," which were not found to be credible.

In September 1990, approximately a week after the court denied the petition, the father filed a request for consent to relocate with the children to Utah, where he had a job opportunity. The mother responded by filing another petition for relief from abuse and a motion to modify custody. The petition was denied, but another court-ordered psychological family evaluation followed, in which Jeremy described incidents of sexual abuse. The examining psychologist, Dr. Jonathan Rightmyer, concluded that Jeremy's report of abuse was not credible because it was inconsistent and provided no contextual detail, that the father posed no risk of harm to the safety and welfare of the children, and that the boys' anxious and depressive behavior patterns were the result of the protracted and contentious custody battle, not sexual abuse. Warning that the deep hostilities between the father and the mother threatened the boys with grave psychological distress, the examiner recommended that it would be in the best interests of the children to relocate with the father and his wife.

On October 21, 1990, the mother filed another relief from abuse complaint against the father. Two days later, the case was designated a complex action pursuant to V.R.C.P. 16.1, and Judge Amy M. Davenport sat as presiding judge in the pending request for the father to relocate, the mother's relief from abuse petition, and in all subsequent proceedings. In December 1990, the court granted the father's request to relocate with the children. The court required the father to obtain counselling for Jeremy with a child psychologist or licensed therapist who had a background in counseling children of divorce and some expertise in child sexual abuse. The court noted that

the therapy was needed not because Jeremy's reports were substantiated, but rather to remedy the trauma resulting from his reports of abuse.

In motions filed in August 1991 and January 1992, the mother again requested a custody modification, based on allegations of sexual abuse and on separate incidents involving each child. The first incident occurred at the end of the children's five-week stay with the mother in August 1991. Jeremy became extremely anxious and refused to return to his father's home in Utah. On the day of his scheduled return flight, Jeremy burned his airline ticket and ran away from home for several hours. The court ordered an evaluation by Dr. Rightmyer to assess any changes in Jeremy since the testing conducted in the fall of 1990. Dr. Rightmyer again found the allegations of sexual abuse incredible, and advised that the need for continuity in Jeremy's life weighed in favor of his returning to Utah, despite tensions between the father and son. Dr. Rightmyer also recommended intensive family therapy involving Jeremy, his father, and his stepmother.

The incident involving Kyle occurred at the end of Christmas vacation, on January 3, 1992. The mother and her husband took the boys to the airport for their return flight to Utah. Kyle refused to board the plane, became hysterical, and clung to his mother. Eventually, Jeremy also began crying and refused to board the plane. The mother made arrangements with the father's parents to put the children on a flight the next morning, and left them in the care of local police. When the boys' paternal grandmother saw them off, they boarded the plane without incident.

In a March 1992 order, the family court found insufficient evidence of a material and unanticipated change in circumstances to merit a transfer in custody, but modified certain provisions of the December 1990 order relating to parent-child contact and therapy for the children. Based on Dr. Rightmyer's testimony and the absence of corroborating evidence, the court again concluded that Jeremy's allegations of sexual abuse were not credible. Although the court acknowledged that, in a telephone call with Dr. Rightmyer, Jeremy had retracted his claim that his father had sexually and physically abused him, it did not find that the mother had coached Jeremy or that she had otherwise attempted to set him against his father. On balance, the court found that the benefit of continuity in Jeremy's life in Utah outweighed any difficulties arising from his relationship with his father and his expressed desire to remain in Vermont with his

mother. However, the court expressed grave concerns about the father's ability or willingness to provide and participate in appropriate therapy for the children.

The order regarding individual and family therapy was amended to require the father to report to the guardian ad litem in Vermont on a monthly basis. Henceforth, in addition to the children receiving individual therapy in Vermont during the summer, the father was to arrange individual counselling for Jeremy and to participate with the children in family counselling sessions. Moreover, the father was to provide any therapist seeing the children with copies of the order and other relevant court documents. The court warned that the father's failure to abide by the orders with respect to therapy, coupled with a lack of improvement in his relationship with Jeremy, "could constitute a substantial change in circumstances sufficient to consider whether it is in Jeremy's and even Kyle's best interests to return to Utah."

In August 1992, during visitation the following summer, the mother filed yet another motion to modify custody, this time alleging the father had sexually abused Kyle and that the father had failed to comply with the therapy requirements of the March 1992 order. This is the case now before us on appeal.

Kyle was admitted to Dartmouth Hitchcock Hospital for a physical examination, which revealed a slight cleft in his anal opening that could have resulted from old trauma. Dr. Patricia Cone, a psychologist at Dartmouth Hitchcock, interviewed Kyle. She recommended a full psychological evaluation of the family, including psychological testing of both children and a psychosexual examination of their father. The court ordered the evaluation, which was performed by Dr. Cone and Dr. Amy Wallace, a psychiatrist at Dartmouth Hitchcock, and also ordered a psychosexual evaluation of the father, which was performed by Dr. Robert Card, a Utah psychiatrist recommended by Dr. Cone.

In preparing their report, the Dartmouth team conducted interviews and observations of the boys and the mother, and to a lesser extent, the father and his wife. Based on these interviews, they concluded that Kyle was suffering severe emotional and psychological stress as the result of sexual abuse by his father. The team found Kyle's claims of abuse to be credible, despite their similarity to Jeremy's previous unsubstantiated and retracted claims. The report concluded that past evaluations, which found the claims of abuse incredible, were unreliable due to Dr. Rightmyer's lack of expertise in assessing child victims of sexual abuse. The team discounted Jeremy's claims that the mother had coached him and his brother

regarding the abuse and had staged incidents to make it appear that the boys were afraid of their father.

The Dartmouth Hitchcock report recommended that parental rights and responsibilities be transferred to the mother, and that she immediately seek individual and family counselling for Kyle and Jeremy. It also recommended that the father have no contact with the boys until he admitted his sexual abuse and successfully completed a treatment program for sexual offenders with an emphasis on treating perpetrators of incest. Contact would then be recommended only if the children wished it and both the children's therapists and the father's therapist agreed the contact should take place.

The Dartmouth Hitchcock team reached its conclusions without reviewing the report from Dr. Robert D. Card, the Utah psychologist whom Dr. Cone had recommended to evaluate the father. Apparently, Dr. Card neither obtained a copy of the Dartmouth report nor sent his report to the Dartmouth team because of the father's failure to provide him with a copy of the court order requiring the evaluation. In any event, Dr. Card concluded that it was "highly unlikely" that the father had sexually abused his children.

Dr. Cone provided extensive testimony at the modification hearing, where she reiterated the report's conclusions and recommendations. In the end, the court accepted Dr. Cone's conclusions and recommendations regarding the credibility of the parties and the children, the existence of sexual abuse, and the conditions for contact between the father and his sons. The court found that "it is more probable than not that Kyle Mullin has been sexually abused by his father." Based on this finding, as well as the father's continuing denial of having abused his children and his failure to participate in family therapy and obtain individual counselling for the boys, the court concluded that the father "is unable to provide either of the children with a safe environment." Accordingly, the court transferred custody, which had been with the father and his wife for the previous six years, to the mother.

Further, the court conditioned any contact between the father and the boys—whether by phone, mail or in person—on the father's acknowledgment of the sexual abuse. The court recognized that the lack of contact with the father would be a "significant loss" for the children, particularly Jeremy, and that the loss of the children's relationship with their stepmother, who had "played a significant parental role in the children's lives," would also be lost. Nonetheless, the court concluded that the condition was necessary to "ensure the

safety of the children from further abuse and emotional trauma." Finally, the court ordered the father to pay all of the children's, and part of the mother's, attorney's fees, as well as the uninsured cost of the Dartmouth evaluation and all costs associated with Dr. Cone's testimony.

On appeal, the father argues (1) that the mother did not meet the threshold burden of proof for a modification of physical custody; (2) that several of the court's findings were not supported by the evidence; (3) that conditioning any contact between the father and his sons on his admitting he sexually abused them is not in the children's best interest; and (4) that ordering the father to pay certain attorney's fees and other costs was an abuse of discretion.

## II.

We first consider whether there was sufficient evidence to transfer custody of the children to the mother. The father argues that neither the one instance of sexual abuse that had allegedly taken place since the mother's last previous claim of abuse was rejected by the court, nor his failure to follow every aspect of the court's March 1992 order regarding therapy for him and the children, satisfied the mother's "heavy burden" of making a threshold showing of a substantial and unanticipated change of circumstances. See 15 V.S.A. § 668 (upon moving party's "showing of real, substantial and unanticipated change of circumstances," court may modify custody order if it is in best interests of child); see also *Pill v. Pill*, 154 Vt. 455, 459, 578 A.2d 642, 644 (1990) (moving party has heavy burden to prove changed circumstances); *Kilduff v. Willey*, 150 Vt. 552, 553, 554 A.2d 677, 678–79 (1988) (giving stability to children's lives "is so important that custody ought not to be modified without critical justification").

As noted, the trial court stated two independent reasons for its conclusion that a substantial change in circumstances had occurred since its March 1992 order. First, the court found that the father had sexually abused Kyle. Second, the court found that the father demonstrated an inability to meet his children's mental health needs by failing to comply with specific provisions of the December 1990 and March 1992 court orders mandating appropriate individual and family therapy. If either finding supplies a reasonable basis for the decision that a real, unanticipated and substantial change of circumstances has taken place, then the court did not abuse its discretion in ruling that the § 668 threshold had been met.

■ We need not consider whether the court's second basis for transferring custody met the threshold test because we conclude that the court's finding of sexual abuse surely did. There can be no question that sexual abuse of a child by a parent poses grave danger to the child's well-being and best interests. Cf. *Lane v. Schenck*, 158 Vt. 489, 497–98, 614 A.2d 786, 790–91 (1992) (threshold test promotes best interests of children by preventing potentially harmful dislocations in their lives for other than serious reasons). Thus, the court acted within its discretion in transferring custody of the children based on its finding of sexual abuse. *Id.* at 494, 614 A.2d at 788 (court's determination of whether substantial and unanticipated change of circumstances has taken place may be disturbed only for abuse of discretion).

■ The father points out, however, that until this last proceeding, no court had found sufficient evidence to support the mother's prior allegations of sexual abuse, and that in this case Kyle alleged only one new act of abuse that had occurred since the March 1992 order. According to the father, a single suspect allegation cannot rise to the level of a substantial change in circumstances. We disagree. Even assuming the court's finding of abuse was limited to a single, substantiated allegation of sexual abuse, that would constitute a threshold change of circumstances.

■ As for the "suspect" nature of the incidents of abuse, the father's contention is that the court's finding of abuse was based on clearly erroneous findings of fact and was not supported by the evidence. On review, we examine the trial court's findings of fact only for clear error. V.R.C.P. 52(a)(2). Factual findings are viewed in a light most favorable to the prevailing party, disregarding modifying evidence. *Jarvis v. Gillespie*, 155 Vt. 633, 637, 587 A.2d 981, 984 (1991). "A finding will not be disturbed merely because it is contradicted by substantial evidence; rather, an appellant must show there is no credible evidence to support the finding." *Highgate Assocs. v. Merryfield*, 157 Vt. 313, 315, 597 A.2d 1280, 1281 (1991).

■ The father claims that the trial court improperly discounted Jeremy's testimony that the mother had coached him to lie about the sexual abuse, and that he had lied when he said his father had abused him. The father also claims that the court erred by finding Kyle's reports of sexual abuse credible. After careful review of the record, we cannot say that the court's findings regarding the credibility of Jeremy and Kyle were clearly erroneous. The court considered

evidence from psychological reports and from its own interviews with the boys. This evidence could support the conclusion that Kyle's account of what happened, and not Jeremy's, was, more likely than not, the truth. In light of the highly deferential standard of review, we conclude that the trial court's findings as to the boys' respective credibility were not clearly erroneous. *Peckham v. Peckham*, 149 Vt. 388, 390, 543 A.2d 267, 269 (1988) (as trier of fact, trial court is in best position to assess credibility of witnesses and weight to be accorded to evidence).

The father also claims that a number of the court's other findings are clearly erroneous. For two of these findings, the father essentially restates his disagreement with the trial court's findings that Kyle's reports of sexual abuse were credible, and that Jeremy's recantation of earlier reports of abuse, and his insistence that his mother coached him and Kyle, were not credible. We reiterate that our role in reviewing findings of fact is not to reweigh evidence or to make findings of credibility de novo. *Peckham*, 149 Vt. at 390, 543 A.2d at 269. The father quotes substantial portions of the record to illustrate evidence that purportedly detracts from the court's findings with respect to the boys, but this simply demonstrates the existence of conflicting evidence. This does not satisfy the father's burden of showing the absence of credible evidence of abuse. See *Merryfield*, 157 Vt. at 315, 597 A.2d at 1281.

■ Next, the father argues that the court erroneously found the conclusions of Dr. Card, the psychologist who performed the psycho-sexual evaluation of the father, to be unreliable. Dr. Card concluded, based on results from a battery of tests, that it was highly unlikely that the father had engaged in "deviant sexual activities." He candidly admitted, however, that all the information about the father used in the evaluation was self-reported, and that no tests could prove conclusively that the father had not abused his sons. Moreover, the fact that Dr. Card provided evidence militating against a finding that the father had committed the abuse did not preclude the court from concluding, based on other credible evidence, that the abuse had occurred.

The father contends, however, that the trial court's reliance on the evaluation performed by Dr. Patricia Cone and Dr. Amy Wallace of Dartmouth Hitchcock Hospital was clearly erroneous because the report was incomplete and the doctors were biased against him. Regarding the first point, the father points out that the original order required that a comprehensive forensic evaluation be prepared of the

Mullin-Phelps family and any other person with whom the children had a significant relationship. Though the final report may not have conformed precisely to the court's original order, the court was not foreclosed from considering it in determining how the best interests of the children could be served. Moreover, the court did not rely solely on the report in making its findings and conclusions. We conclude that the court did not abuse its discretion in relying on the report, even though the scope of the evaluation may have been more limited than first contemplated.

Nor do we conclude that the court abused its discretion by relying on the Dartmouth Hitchcock evaluation in the face of the father's claims (1) that the tone of the report demonstrated clear bias against him and his wife, and (2) that Dr. Cone's characterization of Jeremy's relationship with his mother was flatly contradicted by statements Jeremy made in a videotape viewed by the court. Once again, the father's arguments boil down to a claim that the court accorded Dr. Cone's evaluation and testimony too much weight and credibility. We recognize that the Dartmouth report contrasts the mother's controlled and helpful manner during interviews with the father's belligerent and selfish behavior. We further recognize that the report suggests that the father's behavior during the interviews showed an indifference to children typical of an abusive parent, while it fails to consider how an innocent parent might respond to repeated evaluations that were the result of false accusations of sexual abuse. Nonetheless, opposing counsel's thorough questioning of Dr. Cone about her report and direct examination testimony, which brought the issue of bias before the court, failed to elicit facts that required the court to find bias or to ignore the report. We find no clear error in the court's reliance on the report.

In sum, we conclude that the court's finding that Kyle had been sexually abused by his father was not clearly erroneous, and that the court did not abuse its discretion by determining that the mother met the threshold test for modification of parental rights and responsibilities. Given the finding of sexual abuse, the court's decision to transfer custody to the mother was within its discretion in furtherance of the best interests of the children.

### III.

#### A.

Although we conclude that there was sufficient evidence for the court to find that it is more probable than not that the father

abused Kyle, we hold that the finding of sexual abuse by a mere preponderance of the evidence was insufficient, as a matter of due process, to terminate all parent-child contact between the father and his sons. Our due-process analysis relies heavily on a United States Supreme Court case, but we emphasize that our holding is also grounded upon Chapter I, Article 10 of the Vermont Constitution, which provides that no person may be justly deprived of liberty, "except by the laws of the land." See *State v. Brunelle*, 148 Vt. 347, 350, 534 A.2d 198, 201 (1987) ("as final interpreter of the Vermont Constitution, this Court has final say on what process is due in any given situation"); *State v. Messier*, 145 Vt. 622, 627, 497 A.2d 740, 743 (1985) (phrase "except by the laws of the land" is synonymous with phrase "due process of law").

At the outset of our discussion, we emphasize that the court's order effectively terminated the father's parental rights. Indeed, the court acknowledged "that given the father's level of denial over the past five years, it is unlikely that he will ever acknowledge responsibility or voluntarily agree to treatment," and that, as a result, neither he nor his wife, who had primary custody of the children for the previous six years, would be able to contact the boys until they reached the age of eighteen. While leaving open the possibility of visits "for therapeutic purposes" at the behest of the children's therapists, the court stated that the father "shall have no right to a regular schedule of parent-child contact" until he acknowledges the sexual abuse, and "shall have no contact with the children by telephone or letter" except for purposes of therapy.

Once we acknowledge that the court's order effectively terminated the father's parental rights, we must consider what standard of proof is required to support such an order.[2] In *Santosky v. Kramer*, 455 U.S. 745, 747–48 (1982), the United States Supreme Court held that due process requires a state to present clear and convincing evidence in a termination proceeding before it can cut off parental rights. Only a few courts, however, have even briefly considered whether this holding should also apply in a divorce or custody proceeding in which the state is not a party.

---

[2] Because plaintiff has framed the issue on appeal in terms of abuse of discretion rather than violation of due process, we recognize that our standard of review is a narrow one—whether there was a fundamental miscarriage of justice we cannot overlook. See *Varnum v. Varnum*, 155 Vt. 376, 383, 586 A.2d 1107, 1111 (1990); V.R.C.P. 61 (defect in court's order is not ground for disturbing order unless refusal to do so would be inconsistent with substantial justice). We conclude that this standard has been met here, where plaintiff was denied any contact with his children.

In *Mallory v. Mallory*, 539 A.2d 995, 997 (Conn. 1988), the Connecticut Supreme Court rejected the father's argument that the clear-and-convincing-evidence standard is required in all custody cases involving allegations of sexual abuse. The court, however, based its decision on the fact that the restrictions on the father's contact with his daughter were neither complete—he could visit her four hours a week under supervision—nor permanent—after one year of counselling sessions, court family-relations personnel would meet with the father to determine whether they should initiate a regular visitation schedule. *Id.* at 997–98. The court held that the normal civil standard—preponderance of the evidence—"is applicable in child custody hearings in which there are allegations that a parent has sexually abused his child, *at least where that parent retains some visitation rights,* which may be reasonably restricted to protect 'the best interests of the child.'" *Id.* at 998 (emphasis added).

Louisiana and Indiana appellate courts have refused to apply the *Santosky* holding in particular custody proceedings involving the termination of visitation rights. In the Louisiana case, the court held that *Santosky* did not apply because, rather than involving the "termination" of parental rights, the case involved a "suspension" of the right to visitation under a statute expressly providing that whenever the court finds abuse by a preponderance of the evidence, it must prohibit visitation until the parent proves that the contact would not harm the child. *W.M.E. v. E.J.E.*, 619 So. 2d 707, 709 (La. Ct. App. 1993). Apparently, there was no constitutional challenge to the statute on due process grounds. The Indiana court refused to apply a clear-and-convincing standard in a modification-of-custody proceeding in which the trial court had terminated the visitation rights of a father with AIDS. The court concluded that the case before it was distinguishable from *Santosky* because the state was not a party to the proceeding, and because the visitation order could be revoked in a future modification proceeding. *Stewart v. Stewart*, 521 N.E.2d 956, 962–63 (Ind. Ct. App. 1988).

On the other hand, some jurisdictions, without discussing *Santosky,* have required clear and convincing evidence to support an order terminating a parent's visitation rights in a custody proceeding. See, e.g., *Arnold v. Naughton*, 486 A.2d 1204, 1206 (Md. Ct. App. 1985) (trial court should have applied "clear and convincing evidence" standard rather than "beyond a reasonable doubt" standard in determining whether sexual abuse was established); *Johntonny v. Malliski*, 588 N.E.2d 200, 201 (Ohio Ct. App. 1990) ("standard of proof

for one contesting visitation is clear and convincing evidence"). Further, this Court's application of *Santosky* in different contexts demonstrates that the nature of the proceeding is not the controlling factor. Compare *Paquette v. Paquette*, 146 Vt. 83, 92, 499 A.2d 23, 30 (1985) (extending *Santosky* due-process analysis to proceeding in which stepparent and natural parent sought custody, Court held custody may be awarded to stepparent if clear and convincing evidence shows natural parent is unfit),[3] with *In re A.D.*, 143 Vt. 432, 435–36, 467 A.2d 121, 123–24 (1983) (refusing to extend *Santosky* holding to CHINS proceedings, where parental rights are only temporarily curtailed).

In determining what standard of proof is required to terminate parent-child contact, the Court in *Santosky* examined the three criteria specified in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976): "the private interests affected by the proceeding; the risk of error created by the State's chosen procedure; and the countervailing governmental interest supporting use of the challenged procedure." *Santosky*, 455 U.S. at 754. The Court pointed out that the first criterion does not directly consider the interests of the children because, until shown otherwise, it is presumed that it is in their best interest to remain in the custody of their natural parents. *Id.* at 760, 765; cf. 15 V.S.A. § 650 (legislature finds maximum physical and emotional contact with *both* parents following divorce is in best interest of minor children, "unless direct physical harm or significant emotional harm to the child or a parent is likely to result from such contact"). Rather, the interests of the opposing parties—in this case, each parent—must be considered.

Here, the father's interest in not having parent-child contact terminated is similar to the parents' interest in a termination proceeding. Cf. *In re Guardianship of H.L.*, 143 Vt. 62, 65, 460 A.2d 478, 479 (1983) (citing *Santosky*, Court held due process protects "*[b]oth* the right of a parent to custody *and* the liberty interest of parents and children to relate to one another in the context of the family, free of governmental interference") (emphasis added). On the other side, the mother's countervailing interest in protecting her

---

[3] Although we declined to extend the *Paquette* holding to a divorce proceeding in which both natural parents were seeking custody, *Bancroft v. Bancroft*, 154 Vt. 442, 448, 578 A.2d 114, 118 (1990), the trial court in *Bancroft* had granted the husband substantial visitation rights. Thus, the question of whether, in the context of a divorce or custody proceeding, due process requires clear and convincing evidence to terminate either parent's right to *any* parent-child contact was not at issue.

children is analogous to the state interest in a termination proceeding under the third *Mathews* criterion. While a parent's interest in protecting his or her children is arguably more compelling than the similar state interest in a termination proceeding, it can be satisfied without completely terminating contact between the children and the parent accused of abusing them. See Annotation, *Denial or Restriction of Visitation Rights to Parent Charged With Sexually Abusing Child*, 1 A.L.R.5th 776, 784 (1992) (some courts have found it in best interest of children to have supervised visitation with parent found to be sexually abusive); *Arnold v. Naughton*, 486 A.2d at 1207 (supervised visitation with noncustodial sexually abusive parent may be granted where safety of child is assured).

■ Regarding the second *Mathews* criterion, there is no equivalent concern in a divorce or custody proceeding with the state's superior ability in a termination proceeding to assemble its case against the parents. *Santosky*, 455 U.S. at 763. The accused parent, however, may face a former spouse who will do or say anything to obtain custody or to prevent the other spouse from obtaining custody, sometimes even to the extent that it devastates the children's lives. The fact that custody proceedings involving private litigants often pit decidedly interested and sometimes belligerent parties against each other militates against terminating parent-child contact based on less than clear and compelling evidence.

■ Further comparisons between termination and custody proceedings suggest that the risk of error from using a preponderance standard is equally substantial in both types of proceedings. First, as in a termination proceeding, the trial court in a divorce or custody proceeding "possesses unusual discretion to underweigh probative facts" that might favor one of the parents. *Id.* at 762. Second, as is well demonstrated here, it is very difficult for either parent in a custody proceeding to establish a "double jeopardy" or "res judicata" defense against repeated claims of abuse or other attempts by one parent to cut off the other's contact with the children. *Id.* at 764. As a practical matter, because children who report sexual abuse often have difficulty pinpointing when the abuse occurred, these defenses are limited. Cf. *State v. Ross*, 152 Vt. 462, 465, 568 A.2d 335, 337 (1989) (because young children have difficulty specifying dates on which sexual abuse occurred, State need show only that offenses occurred within statute of limitations). Third, custody proceedings do not provide parents with procedural protections available in termination proceedings,

such as assigned counsel for indigent litigants and separate stages of adjudication. See 13 V.S.A. § 5232(3) (court shall assign counsel to needy persons, including parents, in juvenile proceedings when interest of justice requires it).

In the final analysis, the minimum standard of proof tolerated by due process reflects the appropriate risk of error society is willing to allow in certain types of proceedings. *Santosky*, 455 U.S. at 755. The Supreme Court has mandated a clear-and-convincing-evidence standard in state proceedings involving important interests more substantial than the mere loss of money. *Id.* at 756. Even if the state is not a party in custody proceedings involving private litigants, state courts pronounce judgments that often rely heavily on investigations or evaluations by state agencies or private professional groups that serve the public. Regardless of who initiates the proceedings, the interests of both parents—the potential loss of parent-child contact and the countervailing concern for the children's safety—are far more significant than monetary interests. The interests of the parent alleging sexual abuse, though important, can be protected by ordering supervised visitation between the parent accused of abuse and the children. Therefore, the accused parent should not be required to share equally the risk that the court ruled wrongly in deciding whether to terminate parent-child contact based on accusations of sexual abuse.

Accordingly, we hold that in divorce or custody proceedings the family court may not terminate child-parent contact of either parent absent clear and convincing evidence that the best interests of the child require such action. Here, the evidence of sexual abuse was vigorously contested. Although we cannot conclude that the court's finding of sexual abuse by a preponderance of the evidence was clearly erroneous, we conclude that due process required the court either to find the existence of sexual abuse by clear and convincing evidence or to permit, at minimum, continued contact between the father and the boys consistent with their safety.

## B.

We are also concerned that the family court's order conditioned the father's contact with his children on his admitting he sexually abused them. The only case we have found that addresses the "difficult question" of whether a court in a divorce or custody proceeding may condition visitation upon an admission of sexual abuse is *Nelson v.*

*Jones,* 781 P.2d 964, 969 (Alaska 1989), where the Alaska Supreme Court found no clear error in the trial court's denying visitation as long as the father remained in denial. In that case, however, the father stipulated that the court had found "clear and convincing" evidence that he sexually abused his daughter, and in fact, the evidence of abuse, including the physical evidence, was compelling. Moreover, in support of its affirmance of the trial court's decision, the court cited a New York *termination* case in which the finding of sexual abuse was supported by *clear and compelling evidence. Id.* at 970 n.7 (citing *Duchess Cty. Dep't of Social Servs. v. Mr. G.,* 534 N.Y.S.2d 64, 65, 72 (Fam. Ct. 1988)).

 Regardless of the strength or credibility of the evidence of sexual abuse, specifically conditioning the father's future contact with his sons on his admitting that he sexually abused Kyle violates his privilege against self-incrimination. See *In re M.C.P.,* 153 Vt. 275, 300, 571 A.2d 627, 641 (1989); *In re J.G.W.,* 433 N.W.2d 885, 886 (Minn. 1989). While a court may require abusive parents to submit to therapy, and parental rights may be terminated without violating the fifth amendment based on the fact that the parents' denial of their problem prevented effective therapy, the court's specific condition requiring the father to acknowledge conduct for which he could be prosecuted must be stricken. *In re M.C.P.,* 153 Vt. at 301, 571 A.2d at 641.

## IV.

Finally, the father challenges the portion of the court's order compelling him to pay certain fees and costs. Based on affidavits filed at the beginning of the proceedings, the court ordered the father to pay, among other expenses: (1) up to $3,000 of the mother's reasonable attorney's fees and litigation costs incurred between July 1, 1992 and January 22, 1993; (2) all fees for the children's attorney incurred in the same time period; and (3) all uninsured costs for the Dartmouth Hitchcock family evaluation and costs associated with Dr. Cone's court appearances. The father contends that the court's order constitutes an abuse of discretion because it was based only on undated financial affidavits briefly mentioned in the order.

 In proceedings dealing with motions to modify parental rights and responsibilities, the trial court may award attorney's fees in its discretion. *Cleverly v. Cleverly,* 151 Vt. 351, 358, 561 A.2d 99, 103 (1989). The power to allocate expenses among the parties mitigates

the potentially onerous financial burden that can befall one who seeks to promote a child's best interests. In fashioning an award, the court's primary consideration is the financial resources of the parties. *Ely v. Ely*, 139 Vt. 238, 241, 427 A.2d 361, 363 (1981).

The court's order and the record show that the court gathered information from affidavits filed by the parties as to their respective resources. The court found, and the father does not contest, that he owns substantial assets and earns a gross monthly income twelve times that of the mother. The court ordered the mother to file affidavits to substantiate her costs and legal fees, and the father could contest any amounts he believed were unreasonable. Moreover, the court was cognizant of the father's child support and other obligations under the order, and accordingly capped the amount he had to pay for the mother's attorney's fees at $3,000. Considering the relative resources of the parties, the order to pay costs and other fees was reasonable. The trial court did not abuse its discretion.

The mother has also moved that the father pay $1,000 of her attorney's fees on appeal. This Court may award reasonable attorney's fees on appeal in actions seeking modification of a divorce decree. See *Bibens v. Bibens*, 144 Vt. 287, 289, 476 A.2d 134, 135 (1984). We believe, however, that in light of the trial court's findings and order allocating costs and fees, an award of costs on appeal is unwarranted. The court recognized that the mother's attorney's fees would likely be "considerably higher" than the $3,000 allotted, but limited the award to ensure that the father could meet his obligations to pay child support and the other fees and costs imposed on him. For the same reason, we deny the mother's motion for an award of attorney's fees for this appeal.

## V.

The peculiar difficulty of this case lies in the confluence of the extraordinary gravity of the allegations of wrongdoing, the inconclusiveness of the evidence, taken as a whole, on the issue of such wrongdoing, and the devastating nature of the remedy imposed. Despite such difficulties, we recognize that the trial court was obliged to reach a decision, and we support that decision—to the extent of our deference to its assessment of the credibility of the witnesses—by our holding that there was sufficient evidence to warrant the finding of abuse, and by our recognition that the transfer of custody constituted an appropriate exercise of the court's discretion.

We cannot, however, close our eyes to the fact that, where, as in this case, the evidence is less than clear and convincing, the assessment of even the most conscientious of judges as to where the truth lies may be no more than an educated guess. It may be comforting, in some sense, to pretend to judicial omnipotence or infallibility, or else simply to ignore ambiguity and doubt. To do either, however, is to deny reality and, indeed, the very humanity of judicial institutions. Thus, the proper course in a case such as this will be found in a resolution that seeks to accommodate the rights and interests of all concerned, not one that may be appropriate if the court managed to get the facts right, but unfathomably destructive if it was mistaken. Limited, supervised visitation, for example, might not provide complete psychological protection for these children if, indeed, their father was guilty of the conduct alleged. In our view, however, that risk is preferable to an unwarranted death sentence on the relationship between this man and his children.

The overriding theme of the dissent is that we have failed to consider the interests of the children. This criticism is unfounded. We agree that the interests of the children are paramount in custody cases, but we recognize that among the interests of children is that of maintaining their relationship with both parents. Morever, the children's interests are not the only interests we are obligated to protect. In balancing these various interests, we hold today that an outcome as devastating as the complete severance of a parent-child relationship must, for the sake of the children as well as for the sake of the parent, rest on a firmer foundation than mere preponderance of the evidence.

*The family court's February 16, 1993 order is affirmed in all parts, except that the provision therein regarding defendant's right to parent-child contact is reversed, and the matter is remanded for reconsideration of the visitation issue consistent with this opinion.*

**Allen, C.J.,** concurring and dissenting. This case affirms the maxim that hard cases make bad law. Although I concur with parts I, II and IV of the Court's opinion, I disagree with part III, in which the Court holds that, as a matter of federal due process, a restraint on parent-child contact for an indefinite period must be based on findings supported by clear and convincing evidence.[1]

---

[1] I agree that the requirement that the father admit the sexual abuse unacceptably compromises his right against self-incrimination.

## I.

First, I believe the Court misconstrues the order in holding that it effectively terminates the father's parental rights. In its provisions for contact between father and sons, the family court curtailed the father's visitation rights for an indefinite period. It did not terminate those rights. Though harsh, the family court's order leaves open the possibility of limited contact and the establishment of regular visitation. Moreover, the order is not final, and the possibility of increased contact exists.

In contrast, termination of parental rights is *"final* and irrevocable," and entails state action both severe and irreversible. *Santosky v. Kramer*, 455 U.S. 745, 759 (1982). In a termination action, the State takes an active, partisan role and "marshals an array of public resources" to make a case against the parents. *Id.* at 760. "The State's ability to assemble its case almost inevitably dwarfs the parents' ability to mount a defense." *Id.* at 763. Custody proceedings, in which the parents contest the right to contact with the children, do not ordinarily entail such disparities of resources. Furthermore, the state plays only a tangential role in custody proceedings, notwithstanding the fact that the parties may "rely heavily on investigations or evaluations by state agencies or private professional groups that serve the public." *Mullin v. Phelps*, 162 Vt. 250, 267, 647 A.2d 714, 724 (1994). Finally, as the *Santosky* Court noted, termination of parental rights works potentially far-reaching consequences, including permanent loss of the right to support and maintenance, the right of inheritance, and all other rights "'inherent in the legal parent-child relationship.'" *Santosky*, 455 U.S. at 760 n.11 (quoting *In re K.S.*, 515 P.2d 130, 133 (Colo. Ct. App. 1973)). Here, the family court's order regarding contact in no way affects these attributes of the parent-child relationship. In short, the significant differences between termination proceedings and custody proceedings precludes treatment of the parent-child contact provision as a termination of parental rights. The *Santosky* due process analysis was tailored for the latter—it does not fit the former.

## II.

On appeal, the father has questioned the family court's exercise of discretion in imposing the terms for contact with his children, and the majority tacitly accepts the family court's discretion to fashion custody determinations. *Nickerson v. Nickerson*, 158 Vt. 85, 88–89, 605 A.2d 1331, 1333 (1992). Rather than confront the propriety of that court's exercise of discretion in limiting the father's contact, the

Court embarks upon a due process analysis guided by *Santosky v. Kramer*. *Santosky* held that due process mandates, at minimum, that the *State* make its case for *permanent termination of parental rights* by clear and convincing evidence. 455 U.S. at 769. As explained above, I harbor significant doubt that *Santosky* should control a due process analysis in this context. But even accepting that *Santosky* sets forth the appropriate analysis, I do not agree that due process mandates an elevated level of proof in this custody proceeding.

Determining what process is due requires consideration of three distinct factors: the private interests affected, the risk of error created by the State's chosen procedure, and the countervailing governmental interest in maintaining the challenged procedure. See *id.* at 754 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). The Court acknowledges the interest of the children at the outset but then gives short shrift to that interest, which should be the compelling concern in custody determinations.

The Court turns first to an analysis of the private interests involved. I readily agree that parents and children share a fundamental liberty interest in association free of state interference. However, the child also has a vital interest in personal safety and physical and emotional well-being. See *In re A.D.*, 143 Vt. 432, 435–36, 467 A.2d 121, 124 (1983). The Court disregards this separate interest, presuming, as the *Santosky* Court did, that "until shown otherwise," it is in the children's best interest to remain in the custody of their parents. In assessing the private interests involved, the *Santosky* Court justified its assumption that parents and child share an identity of interests based on the bifurcated nature of the termination proceedings at issue. 455 U.S. at 759–61. In those proceedings, the State seeks termination of all rights, and must make a threshold showing that the parents are unfit before a court may assume that the interests of parents and children diverge. See *id.* Custody proceedings in divorce cases are a different matter.

In custody modification proceedings, the extant custody arrangement is presumed to be in the best interest of the children, absent proof of a substantial change in material circumstances and proof that an alternative arrangement would better promote that interest. See 15 V.S.A. §§ 665, 668. This Court affirms the family court's conclusion that a substantial change in circumstances has occurred, based in part on findings of abuse at the hands of the father. Only at this point may the family court consider alternative arrangements based on the best interest of the children, *Kilduff v. Willey*, 150 Vt. 552, 553, 554 A.2d 677, 678 (1988), including severe restraints on parent-child contact. In addition, once the finding of substantial change based on

an abusive situation has been made, the interests of children and parent diverge and the distinct interests of the children must be taken into account. I do not argue at this point in the analysis that the finding of abuse by a preponderance of the evidence suffices to permit "effective termination" of parent-child contact. The finding should, however, dictate that the interests of the children in personal safety and freedom from abuse be taken into account as distinct private interests. Indeed, the Court points out that maximum contact with both parents following divorce furthers the best interest of the children, "unless direct physical harm or significant emotional harm . . . *is likely to result* from such contact." 15 V.S.A. § 650 (emphasis added). This Court also has held that "'a child is a person, and not a subperson over whom the parent has an absolute possessory interest. A child has rights too, some of which are of a constitutional magnitude.'" *Paquette v. Paquette*, 146 Vt. 83, 89, 499 A.2d 23, 28 (1985) (quoting *Bennett v. Jeffreys*, 356 N.E.2d 277, 281, 387 N.Y.S.2d 821, 824–25 (1976)). I must conclude that the interests of the children cannot be subsumed in the interests of the parents in the context of this custody proceeding, but must be considered as a distinct element in the due process calculus.

Regarding the nature of the private interests involved, the father has a significant interest in maintaining contact with the children. The Court likens the mother's interest to that of the state, a countervailing interest in protecting the children from abuse. Conceding that "a parent's interest in protecting his or her children is arguably more compelling than the similar state interest in a termination proceeding," the Court downplays this interest by suggesting that it may be satisfied through supervised visitation instead of "effective termination" of contact. The point of this due process analysis, though, is to discern what level of proof is required before the family court may severely constrain parent-child contact, not to consider alternatives to this constraint, a matter committed to the discretion of the family court. Thus, alternative dispositions are irrelevant to the due process analysis, and the mother's interest in protecting her children from abuse deserves greater weight than this Court would afford. Finally, there must be consideration of the interests of the children in continued contact with both parents and freedom from abuse. In sum, a constitutionally sufficient due process analysis must take into account the private interests of the father, the mother, *and* the children. The Court's failure to examine all these interests unduly favors the father at the expense of the children.

Moving into the second part of the *Mathews* analysis, the Court examines the risk of error from a preponderance standard, and what

an erroneous deprivation would exact from each parent. Since the custody proceeding entails an adversary contest involving the parents and the children, "the relevant question is whether a preponderance standard *fairly allocates the risk* of an erroneous factfinding." *Santosky*, 455 U.S. at 761 (emphasis added). Having discounted the separate interests of the children in maintaining contact with both parents and in living free from abusive treatment, the Court looks only to the harm that would befall each parent from an incorrect finding. But as explained above, the significant differences between the termination proceedings in *Santosky* and the custody proceedings in this case demand consideration of the harm that could come to the children through erroneous findings.[2]

Unquestionably, the father faces a significant loss if the family court incorrectly "terminates" his right to contact with the boys by a preponderance of the evidence. Unlike the termination proceedings in *Santosky*, however, the custody order at issue in this case is not a final order; the father may move for modification at a later date. Ostensibly, the mother loses nothing if the father's rights are erroneously curtailed. In this scenario, the children suffer harm to their interest in continued regular contact with their father.

If the family court erroneously finds, by a preponderance of the evidence, that the abuse did not occur, the father's contact with the children remains intact. The mother suffers harm to her interest in protecting the children from abuse. The burden of an erroneous finding falls heaviest on the children, because continued contact with the abusive parent places the children at risk of contact inimical to their physical, emotional, and psychological well-being.

Proving sexual abuse by any standard poses a formidable task; proof by a preponderance of the evidence should not be equated with mere allegation. As shown above, even this standard subjects the children to a considerable risk of harm. Implicit in the Court's analysis is a consideration of "the probable value, if any, of additional or substitute procedural safeguards," in this case a higher burden of proof. *Mathews v. Eldridge*, 424 U.S. at 335. Raising the standard of

---

[2] The Court reasons that "custody proceedings involving private litigants often pit decidedly interested and sometimes belligerent parties against each other[, which] militates against terminating parent-child contact based on less than clear and compelling evidence." The same may be said for a change of custody, which can occur based on a preponderance of evidence of a substantial change of circumstances and a showing that the change is in the best interest of the child. See 15 V.S.A. §§ 665, 668.

proof to clear and convincing evidence allocates a disproportionate risk of error to the children. Factfinding in such cases poses an extremely difficult task. The evidence in this case, with recanted stories of abuse and conflicting opinions by the experts, is anything but atypical. Requiring proof of the abuse such that there is no serious or substantial doubt about its existence will unduly deprive the family court of the power to fashion remedies for the protection of children. Therefore, I conclude that though the risk of erroneous deprivation may fall hard on the father, anything more than a preponderance of the evidence standard unfairly exposes the children to risk of greater harm.

Though the *Mathews* test comprises three parts, each of which the *Santosky* Court examined, the Court fails to consider the third factor, "the countervailing governmental interest supporting use of the challenged procedure." *Santosky*, 455 U.S. at 754. The state, as parens patriae, "has a legitimate and compelling interest in the safety and welfare of the child." *In re A.D.*, 143 Vt. at 435, 467 A.2d at 124; accord *Santosky*, 455 U.S. at 766. The legislature has adopted as an overarching public policy that custody determinations be fashioned according to the best interests of the child. See 15 V.S.A. § 665(b); *Bissonette v. Gambrel*, 152 Vt. 67, 70, 564 A.2d 600, 602 (1989); see also 15 V.S.A. § 650 (maximum parental contact in child's best interest unless child would suffer physical or significant emotional harm). Mindful of this policy, this Court has stressed that in custody determinations, "[t]he focus of the court's decision must be the best interest of the child, not equity between the parties." *Bissonette*, 152 Vt. at 70, 564 A.2d at 602. Where the rights of the parent and the best interest of the child cannot be reconciled, "the best interests of the child must be given first priority." *Paquette v. Paquette*, 146 Vt. at 88, 499 A.2d at 27. The state's significant parens patriae interest, which in large part seeks to protect children from abusive environments, is well served by a preponderance of the evidence standard.

In my view, a complete due process analysis leads to the conclusion that a departure from the preponderance of the evidence standard is unwarranted. On balance, an uncertain enhancement in the truth-finding function of the court cannot justify a greater risk of harm to the countervailing interests of the child, the parents, and the state in the child's welfare and safety. "[T]he minimum standard of proof tolerated by the due process requirement reflects not only the weight of the private and public interests affected, but also a societal judgment about how the risk of error should be distributed . . . ."

*Santosky*, 455 U.S. at 755. In light of the overriding public policy to promote the best interests of children, children should bear no more than the already considerable risk of error they face under the preponderance of the evidence standard.

### III.

The enhanced proof standard also creates practical problems that the Court fails to consider. The Court establishes a rule, of constitutional dimension, that "effective termination" of parental rights in a custody proceeding must be based on clear and convincing evidence, but neglects to draw the line between permissible limitation and effective termination. The trial courts are left with no practical guidance as to what would bring the elevated proof standard into play. Today's ruling needlessly complicates the already formidable task of formulating custody determinations that further the best interests of the child.

I acknowledge the problem created by acrimonious parents leveling accusations of abuse to secure custody, but an elevated burden of proof will not resolve this problem. If the real problem is the breadth of the court's discretion to make custody determinations, that problem should be addressed directly, not through a skewed due process analysis. I do not believe that the Fourteenth Amendment demands that the family court find abuse by clear and convincing evidence before severe restrictions may be placed on parent-child contact.

The family court has broad discretion in custody matters. *Myott v. Myott*, 149 Vt. 573, 578, 547 A.2d 1336, 1339 (1988). The record in this case might suggest a result different from that reached by the family court, but the proper role of this Court is to review for an abuse of discretion, not to substitute our judgment for that of the family court. We search only to determine whether the family court erroneously exercised its discretion, exercised it upon unfounded considerations, or exercised it unreasonably in light of the evidence. I cannot conclude that it did and would affirm.

Justice Morse joins in this dissent.

**Morse, J.,** concurring and dissenting. The Court approves the preponderance standard of proof to establish a change of custody based on the custodian's sexual abuse of his child, but then decides that, once the abuse is proven, the family court may not fashion the remedy best suited to help the children adapt unless a higher standard of proof (clear and convincing) is met. This Court's direction to the family court is to refashion a visitation award. Such a "Catch

22" is an odd way to promote the welfare of children caught in an abusive relationship with a parent.

The family court's obedience to today's mandate will force the children—against the advice of their therapists—to visit their abusive father, with all of the attendant emotional trauma. The family court originally left future visits by the father with the children in the decisional hands of the children's therapists. The order reads:

> Plaintiff shall have no right to a regular schedule of parent child contact with the minor children until such time as he acknowledges responsibility for his abuse of Kyle, engages in appropriate sex offender treatment including individual and group therapy as recommended by his therapist and *visits between himself and the child are recommended by the child's therapist.*

Given that the Court has stricken the clause requiring the father to admit the abuse, I suggest that the remainder is the only workable remedy. The abusive father may now visit—I presume in a supervised way—even though it may be emotionally harmful to the children. The Court mandates that the family court "permit, at minimum, continued contact between the father and the boys consistent with their safety." Given the Court's unwillingness to permit, as originally ordered, the mental health professionals to protect the boys' emotional health, "safety" must be intended to refer solely to physical well being.

I submit the only way out of this hopeless mess is to give authority to someone in a responsible position to help the children—a kind of "receiver in family bankruptcy." By requiring a recommendation from each child's therapist prior to visitation, the family court did exactly that. I dissent to this Court's undoing it.