*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SUPREME COURT DOCKET NO. 2014-258

JANUARY TERM, 2015

| | | |
|---|---|---|
| State of Vermont | } | APPEALED FROM: |
| | } | |
| | } | Superior Court, Caledonia Unit, |
| v. | } | Criminal Division |
| | } | |
| | } | |
| Bruce Bona | } | DOCKET NO. 288-4-14 Cacr |

Trial Judge: Robert R. Bent

In the above-entitled cause, the Clerk will enter:

Defendant appeals pro se from the trial court's order requiring him to forfeit twenty-one horses that had been taken into custody in connection with an animal-cruelty investigation. We affirm.

The record indicates the following. In June 2014, the State asked the Caledonia Superior Court to order forfeiture of twenty-one horses owned by defendant and seized pursuant to 13 V.S.A. § 354(d). The State asserted that defendant had deprived the horses of adequate food, water, and necessary medical attention, thereby committing the crime of cruelty to animals. At the outset of the first day of the hearing, the court denied defendant's motion to continue, noting the statutory requirement that a hearing be held within twenty-one days of a seizure. Id. § 354(e)(1). But on the second day of testimony, approximately two weeks later, defendant had an opportunity to and did call witnesses of his own. Following a hearing, the court granted the State's request.

The trial court made the following findings. Defendant owns and operates the "Bona Ranch" in Lyndon. In February 2014, a deputy sheriff who had training in animal-cruelty investigations was asked to investigate concerns about horses at the ranch. On February 11, 2014, the deputy sheriff went to look at the animals. He observed a number of very thin horses with protruding ribs, back bones, and pelvic bones. The deputy sheriff noted 1-2 feet of manure in some stalls without bedding. He also noted some animals with cracked hooves. Defendant told the sheriff that he stopped watering the horses when the outside temperature fell below freezing. Defendant also stated that he performed his own veterinary work. The sheriff discussed relinquishing some of the horses with defendant. The deputy sheriff later received a report of a dead horse on the property, and decided to take more comprehensive action. He obtained a search warrant on March 1, 2014.

On March 1, the deputy sheriff went to defendant's property with the search warrant. A veterinarian and other volunteers accompanied the sheriff. The deputy sheriff informed defendant that he had a warrant and that defendant could relinquish the horses if

he chose. The deputy sheriff explained what relinquishment entailed and was satisfied that defendant understood his explanation. Defendant stated that he would relinquish the horses. However, he refused to sign a voluntary ownership relinquishment form.

The animals were each assigned a number, inspected by the veterinarian, and photographed. The veterinarian evaluated the horses' physical condition and level of hydration. He also noted any apparent hoof problems. The inspections started at approximately 4 p.m., and because of the large number of animals, some inspections were conducted after sunset using either ambient or artificial light. The veterinarian testified, and the court found, that there was adequate light to evaluate the animals.

Large animals such as horses are assigned a body condition score, which is a commonly-used scale in animal husbandry. The scoring scale is designed to note horses that are either too fat or too thin. An ideal horse is assigned a score of 5; horses fattier than the ideal are scored up to 9; horses thinner than the ideal are scored down to a 1. The scoring sheets used by the veterinarian on the scene in this case called for the scorer to evaluate individual components of each animal, such as the condition at the neck, withers, loin, crease, tailhead, ribs, and behind the shoulder. A horse's total body condition rating is, according to the structure of these forms, derived from the average of the individual component scores. The veterinarian here did not break down his scoring into the individual parts, but rather assigned an overall body condition score based on his assessment of the animals' overall health. The court found that, while the veterinarian's evaluation was not as detailed as the court might wish, the work performed was adequate for an evaluation of defendant's horses. It also found that the corresponding photographs were, in most cases, insufficiently detailed to provide any assistance to the court.

Six of defendant's horses scored a 1; seven horses scored a 2; seven horses scored a 3; and one horse scored a 4. Based on the scale, horses with a body score of 1 and 2 are showing signs of emaciation. A score of 3 is still regarded as thin, but if some explanation is given for a horse being that thin, such as a work schedule or having recently foaled, there might be no health implication for the horse. Absent an explanation, however, a score of 3 indicates that a horse was not being given enough nutrients.

The veterinarian also noted when he concluded that a horse suffered from dehydration. The veterinarian indicated that the snow banks in the horse yard had been eaten back, indicating that the horses were satisfying their hydration needs by eating snow. The veterinarian also found that sixteen horses were approximately 2% dehydrated and one horse was 4% dehydrated. This confirmed that the horses did not have a free choice of water. The veterinarian had used a pinch test of the horses' skin to determine the state of their hydration. The skin of a 2% dehydrated horse will not return to shape promptly when pinched.

The court added that after the veterinarian left, three dead horses were found in a Quonset hut on defendant's property. No cause of death was determined, and there was no testimony as to the animals' cause of death. The court thus could not reach any conclusion about the cause of death with respect to any individual horse. Given that three horses died, however, the court concluded that the overall conditions at the ranch, including lack of adequate food and water, at least contributed to these animals' deaths.

The court also found that seven of the seized horses had cracked hooves, and a number of the horses had tails that were very heavily matted with burdocks. While not linked to any particular health issue, the veterinarian testified that the matted burdocks can lead to skin problems and tail injury. The only fully healthy horse in the herd, #4, which was adequately hydrated and had a body score of 4, had matted burdocks in its tail. One horse, #3, was rated with a body score of 3 and had no evidence of dehydration. There was no information provided to the court that suggested that the horse was being worked or had some other explanation regarding why it was thin. The court thus concluded that this horse, as well as other members of the herd with the same body score, were not being fed properly. All of the other horses with a body score of 3 had evidence of dehydration.

The State asserted that forfeiture was warranted because the animals were subjected to neglect under 13 V.S.A. § 352(4). That statute provides that a person commits animal cruelty if he "deprives an animal which a person owns, possesses or acts as an agent for, of adequate food, water, shelter, rest, sanitation, or necessary medical attention, or transports an animal in overcrowded vehicles." The terms "sanitation," "adequate food," and "adequate water" are defined by statute. See id. §§ 351(9), (16), (17). The court found by clear and convincing evidence that all of defendant's horses, except #4, had a body score of 3 or less and suffered from either nutrient deficiency, water deficiency, or both. Of the horses with a body score of 3, there was no explanation as to why they were thin, such as being worked or having just foaled. The court found it unclear why #4 had done as well as it had. Nonetheless, given that twenty of horse #4's counterparts had inadequate nutrition or hydration and horse #4 was subject to the same physical surroundings as all the others, the court concluded that horse #4—notwithstanding its relative success in comparison to its companions—did not have access to adequate food and water. It concluded that all of the horses had been subject to privation, and that the State had proved neglect by clear and convincing evidence.

Finally, the court concluded that, although it credited the sheriff's testimony that defendant orally agreed that the sheriff could take the animals, defendant's refusal to sign a relinquishment form cast substantial doubt on the assertion that defendant intended to permanently surrender the animals. For the reasons set forth above, the court ordered the immediate forfeiture of the twenty-one horses pursuant to 13 V.S.A. § 354(f). Defendant appeals from this order.

Defendant's challenges on appeal are too numerous to list by way of introduction. Instead, we identify and address each in turn. On review, we consider the evidence in the light most favorable to the prevailing party, and we will uphold the trial court's findings of fact unless they are clearly erroneous. First Congregational Church of Enosburg v. Manley, 2008 VT 9, ¶ 12, 183 Vt. 574 (mem.). We review the court's legal conclusions de novo. Id.

First, defendant argues that when the veterinarian evaluated the horses, the light was inadequate to enable the veterinarian to make a competent evaluation. The veterinarian testified that there was adequate light for him to evaluate the condition of the horses, and the court credited his testimony. The decision to credit the veterinarian's testimony on this point is within the province of the trier of fact. See Mullin v. Phelps, 162 Vt. 250, 261 (1994) (role of Supreme Court in reviewing findings of fact is not to reweigh evidence or to make findings of credibility de novo).

3

Second, defendant challenges the court's findings concerning the horses' poor body condition on several bases. He contends that the court erred in crediting the veterinarian's assignment of an overall body condition score to each horse in light of the veterinarian's failure to document his assessment of each of the body regions listed on the forms he used to support his overall rating. Defendant argues that the court failed to take into account that the cause of the low body weight may have been cold stress, rather than lack of access to food and water. The veterinarian described to the trial court his evaluation process and the condition of the horses in detail. The veterinarian expressed his professional opinion, based on his evaluation, that the horses had been without adequate nutrition for four to six months. The court found that, while the veterinarian might have engaged in a more detailed scoring process, his evaluation of defendant's horses was adequate and his assessment was reliable. As stated above, it is for the trial court, not this Court, to assess the credibility of witnesses and the reliability of the evidence. See id. There was sufficient evidence in the record to support the trial court's conclusion.

Third, defendant challenges the trial court's findings that many of the horses were dehydrated. He argues that the veterinarian failed to use a test on the horses' mucous membranes rather than the pinch test, which defendant argues was unreliable given the dark and frigid conditions. He points to the margin of error in the pinch test and argues that, taking into account the margin of error, the veterinarian's findings do not support the conclusion that the horses were dehydrated. He argues that the horses found to be 2% dehydrated were not in danger, and asserts that the veterinarian testified that the horses had adequate water to meet their needs. Again, the veterinarian's conclusion concerning the horses' access to water was supported by his pinch tests as well as his observation that the horses had been eating snow from a snow bank to meet their hydration needs. The trial court acted within its authority in crediting the veterinarian's testimony.

Fourth, defendant argues that, although the veterinarian found that some horses had cracked hooves, he did not find that any of the horses were lame or lacked proper care. The finding of unaddressed cracked hooves in many of the horses was not by itself the basis for the veterinarian's opinion. It was part of an overall assessment of the horses' condition that supported the trial court's conclusion.

Fifth, defendant argues that the veterinarian's records do not document any matted burdocks in the horses' tails. However, the trial court's findings concerning burdocks and their potential impact was supported by the testimony of an animal control officer, as well as by the veterinarian.

Sixth, defendant argues that it is not clear that the photographs of the respectively-numbered horses correspond to the respective records made by the veterinarian. The court did not find the photographs helpful in reaching its decision, and thus, defendant's challenge to this evidence is immaterial.

Seventh, defendant challenges the veterinarian's credibility. As noted above, it is not this Court's role to reweigh the evidence or decide whether witnesses are credible. Those are considerations for the trial court. See id.

Eighth, defendant argues that the trial court made no findings that one of the horses—"horse #4"—was underweight, dehydrated, or otherwise suffering from

4

maltreatment. For that reason, defendant argues that "horse #4" was wrongly seized. The question presented to the trial court is whether the horses in question, including "horse #4," were deprived of "adequate food, water, shelter, rest, sanitation, or necessary medical attention." 13 V.S.A. § 352. The trial court concluded that given that the other horses had inadequate nutrition or hydration, and horse #4 was subjected to the same surroundings as the others, horse #4 likewise did not have access to adequate food and water—notwithstanding its relative success in comparison to the others. This conclusion was within the trial court's discretion. In animal cruelty and neglect cases, courts have found that the existence of conditions that amount to a deprivation of food, water, shelter or the like need not wait until the consequences of that deprivation can be seen in the animal's physical deterioration. The trial court's conclusion that horse #4 was subject to conditions of deprivation amounting to animal cruelty is supported by the evidence, and is sufficient to support the seizure.

Ninth, defendant argues that the trial court's finding that he told the deputy sheriff that he stops watering the horses when the outside temperature went below 32 degrees Fahrenheit was based on a misunderstanding. Defendant explains that he told the deputy sheriff that he <u>starts</u> watering the horses when the temperature falls below freezing, since they can no longer rely on pools of water on the property for their water. As we have said before, it is the province of the trial court to weigh the evidence and credit the testimony accordingly. We note that the trial court pointed to the veterinarian's testimony that the horses were eating from snow banks, and that that was not an adequate way to meet their hydration needs, as further support for its conclusion concerning the horses' hydration.

Finally, defendant makes several constitutional arguments citing the Fourth, Fifth, and Sixth amendments to the United States Constitution. Defendant did not argue below that his constitutional rights were violated, and he cannot raise these arguments for the first time on appeal. See <u>Bull v. Pinkham Eng'g Assocs.</u>, 170 Vt. 450, 459 (2000) ("Contentions not raised or fairly presented to the trial court are not preserved for appeal.").[*]

We have considered all of the arguments raised in defendant's brief and find no basis to disturb the court's decision.

<u>Affirmed</u>.

---

[*] The bases for these arguments are unclear. With respect to the Fifth Amendment, the court offered defendant immunity, and nothing in the record supports the suggestion that the court drew negative inferences from defendant's decision not to testify. Likewise, his Sixth Amendment argument appears to be based on the court's denial of his request for a continuance. Given that the hearing continued to a second day, and defendant thus had the opportunity to and did call witnesses of his choosing, it is difficult to understand how his Sixth Amendment rights were implicated. With respect to the Fourth Amendment, defendant argues, as he did below, that the animals were seized rather than voluntarily relinquished. The trial court agreed with him and concluded that the animals had, in fact, been seized. To the extent that he now challenges the seizure on the basis that the sheriff executing the warrant failed to serve it on him properly, defendant did not raise that argument below and we do not reach it here.

5

BY THE COURT:

_____
John A. Dooley, Associate Justice


_____
Beth Robinson, Associate Justice


_____
Harold E. Eaton, Jr., Associate Justice